# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION

JOHNNY WINTERS, JR.                                                      MOVANT

v.                                                      No. 2:10CR153-NBB-DAS

UNITED STATES OF AMERICA                                              RESPONDENT

## MEMORANDUM OPINION

This matter comes before the court on the motion of Johnny Winters, Jr. to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The government has responded to the motion; Winters has replied, and the matter is ripe for resolution. For the reasons set forth below, the instant motion to vacate, set aside, or correct sentence will be denied.

### Section 2255 Proceedings

Section 28 U.S.C. § 2255 permits an inmate serving a sentence after conviction of a federal crime to "move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). As with the writ of *habeas corpus, see* 28 U.S.C. §§ 2241, 2254, a § 2255 motion sets forth only four bases on which a motion may be made: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Thus, a prisoner must claim either a constitutional violations or want of subject matter jurisdiction to invoke 28 U.S.C. § 2255. In the absence of constitutional or jurisdictional defects, a federal prisoner may invoke § 2255 only if the error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185 (1979).

The district court must conduct a preliminary review of a section 2255 motion, and "[i]f it plainly appears from the motion, any attached exhibits, and the record of the prior proceeding that the moving party is not entitled to relief, the judge must dismiss the motion." Rules Governing Section

2255 Proceedings, Rule 4(b). If the motion raises a non-frivolous claim to relief, the court must order the Government to file a response or to take other appropriate action. *Id.* The judge may then require the parties to expand the record as necessary and, if good cause is shown, authorize limited discovery. *Rules Governing Section 2255 Proceedings,* Rules 6–7.

After reviewing the Government's answer, any transcripts and records of prior proceedings, and any supplementary materials submitted by the parties, the court must decide whether an evidentiary hearing is warranted. *Rules Governing Section 2255 Proceedings,* Rule 8. Under the statute, an evidentiary hearing must be held unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). However, the court need not hold an evidentiary hearing if the prisoner fails to produce "independent indicia of the likely merit of [his] allegations." *United States v. Edwards,* 442 F.3d 258, 264 (5th Cir.2006) (quoting *United States v. Cervantes,* 132 F.3d 1106, 1110 (5th Cir. 1998)).

Ultimately, the petitioner bears the burden of establishing his claims of error by a preponderance of the evidence. *See Wright v. United States,* 624 F.2d 557, 558 (5th Cir. 1980). For certain "structural" errors, relief follows automatically once the error is proved. *See Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir.2003). For other errors at the trial court level, the court may grant relief only if the error "had substantial and injurious effect or influence" in determining the outcome of the case. *Brecht v. Abrahmson,* 507 U.S. 619, 637 (1993); *see also United States v. Chavez,* 193 F.3d 375, 379 (5th Cir.1999) (applying *Brecht's* harmless error standard in a § 2255 proceeding). If the Court finds that the prisoner is entitled to relief, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

## Procedural Posture

On October 20, 2010, Johnny Winters was charged in a two count indictment with Conspiracy to Possess with Intent to Distribute Cocaine (Count One), and Possession of a Firearm by a Convicted Felon (Count 2). The Federal Public Defender's Office was appointed to represent Winters following his initial appearance on the indictment on December 8, 2010, but was subsequently replaced on December 13, 2010, with Attorney Roy Percy. On December 17, 2010, an information to establish a prior drug conviction was filed by the United States pursuant to 21 U.S.C. § 851. On January 25, 2011, a Motion for Leave to Appear as Newly Retained Counsel was filed by Attorney Martin dePorres Perkins, and Roy Percy was allowed to withdraw. On July 5, 2011, Attorney Perkins filed a motion to suppress evidence in Winters' case, challenging statements made by Winters to law enforcement, including a confession by Winters to engaging in drug trafficking activities with Quincy Terry. The United States responded on July 11, 2011, and on July 12, 2011, the Honorable W. Allen Pepper scheduled the matter for a hearing that same day. A suppression hearing took place on the afternoon on July 12, 2011, and the court denied Winters' motion to suppress.

On July 26, 2011, a jury was impaneled and trial commenced on the instant offenses. After a four-day trial, the jury returned a verdict of guilty on each count. On October 6, 2011, attorney John H. Daniels, III entered a notice of appearance after being retained to represent Winters for the sentencing and appeal phase of the case. On December 9, 2011, Daniels requested and received an extension of time to file objections to the Presentence Report on behalf of Winters. On January 6, 2012, Daniels filed a sentencing memorandum on Winters behalf.

On February 2, 2012, Winters' case was reassigned following the untimely death of Judge W. Allen Pepper. Sentencing took place on April 30, 2012, and the court imposed a sentence of 121 months imprisonment, which included a sentence of 121 months on Count One and 120 months on Count Two, to run concurrently. The court entered final judgment on May 4, 2012.

Winters appealed the sentence imposed by the court to the Fifth Circuit Court of Appeals. Following full briefing by Winters' attorney and the United States, as well as oral argument before the Fifth Circuit Court of Appeals, the Fifth Circuit affirmed the judgment and sentence on August 1, 2013.

On March 3, 2014, Winters filed the instant Motion to Vacate his sentence under 28 U.S.C. § 2255. The government responded on March 13, 2015, and Winters filed a traverse on September 22, 2014. The matter is ripe for resolution.

## Facts

### Initial Investigation

Beginning in 1999, law enforcement agencies in the Northern District of Mississippi began investigating allegations of drug trafficking by Quincy Terry and his subordinates. Trial Tr., Vol. II, 37 (hereinafter using the format Vol. #, #). The investigation of the Terry Drug Trafficking Organization continued for a decade, involving multiple local, state and federal law enforcement agencies. Vol. II, 37. In 2008, the Drug Enforcement Administration ("DEA") and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assumed the lead in the investigation of the Terry Drug Trafficking Organization, with the goal of dismantling the organization and successfully arresting and prosecuting as many members of the organization as possible. Vol. II, 37-38.

### Court-Authorized Wire Intercepts

During the Terry Drug Trafficking Organization investigation, the DEA obtained authorization to conduct several court-authorized wire intercepts. Beginning in January 2010, the first wire intercept was of a cellular telephone belonging to Edward House, a known cocaine distributor for the Terry Drug Trafficking Organization. Vol. II, 34. As a result of that wire intercept, agents were able to identify DiCarlos Henderson, Quincy Terry's half-brother, as Edward House's source of supply. Vol. II, 50.

As a result, in February of 2010 a spin-off intercept was authorized for DiCarlos Henderson's wire and electronic communications. Vol. II, 50. Agents were then able to identify a number of individuals to whom DiCarlos Henderson was distributing drugs, including Johnny Winters (aka "Slugga"), Edward House (aka "Sum Mo"), Eric Brown (aka "E" or "E-40"), Shawn Longs (aka "Smoke"), Starskey Shaw (aka "Rapper"), and Timothy Bankston (aka "Bank"), among others. Vol. II, 41-43, 58-59.

Through intercepted communications between Henderson and members of the conspiracy, agents established that the Terry Drug Trafficking Organization sold a kilogram of cocaine for $32,000. Vol. II, 87. Agent Price testified at trial concerning slang terms Winters and Henderson used on intercepted wire and electronic communications. For example, Price testified that the slang phrase "it's dry" refers to the drug supplier being out of cocaine, and that the slang term ("4-way") refers to four ounces of cocaine. Vol. II, 93.

In addition to calls and electronic intercepts seized pursuant to the court authorized wire intercept between Johnny Winters and DiCarlos Henderson, agents subpoenaed and studied phone records for the two. Phone records revealed that Johnny Winters and DiCarlos Henderson attempted to contact each other 34 times in early 2010. Vol. II, 92.

**The Arrest of Quincy Terry and DiCarlos Henderson**

On March 8, 2010, Quincy Terry and DiCarlos Henderson were arrested while in the process of cooking powder cocaine into crack cocaine. Vol. II, 60. At the time of their arrest, Quincy Terry and DiCarlos Henderson were found in possession of 3,030.9 grams of powder cocaine, 547.91 grams of cocaine base (crack cocaine), baking soda, hotplates, digital scales with white residue, a money counter, razor blades and drug ledgers. Vol. II, 100-105, 112-116, 133-136.

At trial, Agent Price testified about the significance of items seized at the scene of Terry and Henderson's arrest. For example, Agent Price testified that digital scales are often used to weigh

quantities of cocaine, Vol. II, 103, and that razor blades are often used to cut cocaine.  Vol. II, 110.

**The Drug Ledger**

Agent Price testified that a drug ledger was seized during the Terry and Henderson arrest. Vol. II, 133.  The drug ledger contained the names of individuals that were part of this conspiracy, along with drug quantities, amounts of money, and dates on which money was paid.  Vol. II, 133.  The drug ledger included the names of the following co-conspirators:  Mack (Theophilus Batteast),  Bank (Timothy Bankston), Rapper (Starskey Shaw), E (Eric Brown), Smoke (Shawn Longs), Lil Cuz (Makesha Bradford), Sum Mo (Edward House), etc. Vol. II, 133-142.  In response to Defense counsel questioning, Agent Price confirmed that Quincy Terry, DiCarlos Henderson, Edward House, Theophilus Batteast, Starskey Shaw, Eric Brown, Sean Longs and Timothy Bankston were previously indicted as members of the Terry Drug Trafficking Organization.  Vol. II, 138-143.

The drug ledger also included the street name of the defendant, "Slug," whom Agent Price identified as Johnny Winters.  Vol. II, 140.  Next to Johnny Winters' name was the number $32,000, which Agent Price identified as the price for a kilogram of cocaine.  Vol. II, 138.  Price testified that intercepted communications confirmed that $32,000 was the price for one kilogram of cocaine sold by the Terry Drug Trafficking Organization.  Vol. II, 138.

Agent Price testified that the drug ledger found at the scene of a crack cocaine cook was important because it confirmed who was being supplied cocaine. Vol. II, 133.  The ledger also identified how much people owed for previously supplied cocaine. Vol. II, 138-143.

**DiCarlos Henderson's Cooperation**

Following his arrest on March 8, 2010, DiCarlos Henderson cooperated with law enforcement agents.  On March 12, 2010, Henderson provided information concerning his drug distribution activities for the Terry Drug Trafficking Organization and identified the people to whom he distributed cocaine and crack cocaine on behalf of the Terry Drug Trafficking Organization, including Theophilus

Batteast (aka "Mack"), Timothy Bankston (aka "Bank"), Starskey Shaw (aka "Rapper"), Eric Brown (aka "E" or "E-40"), Sean Longs (aka "Smoke"), and Johnny Winters (aka "Slugga" or "Slug"). Vol. III, 104-108.

DiCarlos Henderson confirmed that he sold cocaine to Winters on three occasions. Vol. III, 110. The first occasion involved a kilogram (1,000 g) of powder cocaine. Vol. III, 110. The next two sales involved four ounces on each occasion. Vol. III, 110. Thus, DiCarlos Henderson sold approximately 1,226.8 grams of powder cocaine to Winters – [(2)(4 x 28.35g) = 226.8 g + 1,000 g = 1,226.8 g]. The kilogram of cocaine that DiCarlos Henderson attributed to Winters was corroborated by the drug ledger, which listed a $32,000 debt that Winters owed to the organization. Vol III, 108. The 32,000 reference referred to the price of a kilogram of cocaine. Vol. III, 107. The four ounce sale of cocaine that DiCarlos Henderson attributed to Winters was corroborated by a recorded conversation, where Henderson quoted Winters a price of three dollars ($3,000) for a 4-way (4 ounces of cocaine). Vol. III, 115. During the conversation between Winters and Henderson, they also discussed how it was "dry," meaning Henderson did not have much cocaine to sell. Vol. III, 118. Winters and Henderson also exchanged text messages, where they discussed cocaine distribution. Vol. III, 119-120.

Henderson also identified Winters' telephone number, interpreted wire and electronic intercepts between himself and Winters, and described the interior and exterior of Winters' residence. Vol. II, 92-93. Henderson confirmed that Johnny Winters' nickname is "Slugga," and identified the name "Slug" from the drug ledger seized at the time of his and Terry's arrest as a reference to Winters. Vol. III, 94, 97-98, 107.

As a result of information obtained from the wiretaps, evidence seized at the time of Terry and Henderson's arrest, as well as information provided by Henderson about individuals to whom he had

been supplying cocaine, agents sought and obtained search warrants for a number of residences. Vol.

II, 133-134.

### The Search of Timothy Bankston's Residence

On June 8, 2010, a search warrant was obtained was for Timothy Bankston's (aka "Bank")

residence. Vol. II, 143-144.  ATF Agent Jackson Price and DEA Agent Dean Gibbs went to the

residence, in plain clothes, to execute the warrant.  Vol. II, 143-144.   After knocking on the door, a

female, later identified as Lanekia Brown, opened the door and invited them in.  Vol. II, 143-144.  The

agents smelled what they recognized to be burning marijuana as they entered the residence.  Vol. II,

144.

As they entered the residence, Agent Price immediately noticed a male seated on a couch ten

to fifteen feet away with an exposed black pistol, *in plain view,* sitting approximately two inches from

his leg.  Vol. II, 145-146.  The pistol was partially shoved between the couch cushion, but was

protruding in such a way that it was plainly visible as Agent Price entered the room.  Vol. II, 145-146.

Agent Price asked the male on the couch, later identified as Johnny Winters, to move towards him.

Vol. II, 145-146.  Although Agent Price did not instruct Winters to show his hands or place his hands

in the air, Winters nevertheless raised his hands when Price told him to move from the couch.  Vol. II,

146-147.  Agent Price secured the Springfield 9 mm pistol, which was loaded with seventeen live

rounds, including one round in the chamber.  Vol. II, 147, 151.  Agent Price confirmed that such a

situation is a law enforcement agent's worst fear, because it can go bad quickly.  Vol. II, 146.

Once the firearm and the residence at 1341 Oak Street were secured, Agents spoke to Lanekia

Brown.  She stated that she had recently rented the residence from Timothy Bankston and had lived

there for about a month.  Vol. III, 14-15.  Brown told agents that Johnny Winters had come over the

night before and that the two of them had smoked marijuana and then fallen asleep on the couch. Vol.

III, 12, 48-49, 203.  Brown stated that they remained on the couch all night, until they heard the agents

knocking on the door.  Vol. III, 203.  She told agents that the gun protruding from the cushions of the couch did not belong to her, she was afraid of guns and did not keep them in her house, and that she had never seen the firearm before.  Vol. III, 205-210.

Agents also spoke with Johnny Winters during the search of the residence.  Vol. II, 162-163, 165-166.  Winters admitted that he was a convicted felon who was not supposed to be around guns, and denied knowledge of the gun next to his leg.  Vol. II, 162-163.  However, he slept on the couch inches from where the gun was located.  Vol. III, 203.  Winters told the agents that he did not know the gun was there.  Vol. II, 188, Vol. III, 11.  Agents told Winters of the nature of their ongoing investigation and asked if he would be willing to answer questions about his involvement in narcotics trafficking with Quincy Terry.  Vol. II, 163, 165-166.  Winters said that he would speak to agents about his involvement with Quincy Terry at a location away from the search warrant site. Vol. II, 166.  Thus, the agents made arrangements to meet Winters at a state park on the outskirts of town.  Vol. II, 166-167.

**Johnny Winters' Interview**

Agents traveled to the state park where they had arranged to meet Winters, and he arrived in his own vehicle a short time later.  Vol. II, 167-168.  Agent Price reminded Winters that he was not under arrest, he could refuse to answer questions, and that he was free to leave at any time.  Vol. II, 168.  Winters agreed to discuss his involvement with Quincy Terry and narcotics trafficking.  Vol. II, 169.

Johnny Winters told agents that he first met Quincy Terry in 2005 in Grenada, Mississippi.  He and Terry discussed the possibility of Terry supplying Winters with cocaine, and Winters later received approximately two ounces of powder cocaine from Terry in 2005.  Vol. II, 169-170.  Winters said that he continued receiving cocaine from Terry during 2005 and until 2007.  Vol. II, 170.  Winters stated

that he received cocaine from Terry on approximately six occasions in amounts that ranged from two ounces to four and a half ounces. Vol. II, 170.

Winters told the agents that Terry always sent him powder cocaine because he liked to cook his own crack cocaine from the powder. Vol. II, 171. Winters explained that he had an individual named "Putman" who would cook the cocaine powder into crack cocaine for him. Vol. II, 171. Winters estimated that he sold about one ounce of crack cocaine per month between 2005 and 2007. Vol. II, 172.

The agents asked Winters how he currently supported himself, and he told them that he promoted his rap music business. Vol. II, 174. He said that he had borrowed money from Quincy Terry on two occasions in the amounts of $1,500 and $1,700 dollars to put on a rap promotion show. Vol. II, 174. However, he denied any current involvement with narcotics trafficking and maintained that he was using his rap music business to preach the gospel to the youth of Grenada. Vol. II, 175-176. Winters elaborated, saying, "I have formed an enterprise whereby I try to teach the youth of Grenada to stay away from violence and drugs." Vol. II, 176.

Agents then questioned Winters about his phone number, which appeared in wire intercepts with DiCarlos Henderson. Winters confirmed that (662) 688-4744 was his phone number, but denied any recent involvement with Henderson, Terry, or narcotics trafficking. Vol. II, 175-176.

At that point, Agents Price and Gibbs asked Johnny Winters for permission to search his residence for firearms, and both agents testified that Winters became agitated. Vol. II, 188, Vol. III, 260. Winters declined to give officers permission to search his residence and asked if he was free to leave. Vol. II, 188-189, Vol. III, 260. When agents said, "Yes," Winters replied "I'm outta here," walked to his vehicle, and drove away. Vol. II, 189, Vol. III, 260.

**The Search of Johnny Winters' Residence**

Following their interview with Johnny Winters, Agents Price and Gibbs contacted Mississippi Bureau of Narcotics Agent Lee Tart and told him about their interactions with Johnny Winters. Vol. II, 188-190. Tart applied for and obtained a state search warrant for Johnny Winters' residence at 660 East Govan Street. Vol. II, 189-190. Agents Price and Gibbs then observed Winters drive to his residence at 660 East Govan Street and go into the house. Vol. II, 191-192.

Agents Price and Gibbs never saw Winters leave the Govan Street residence; they contacted him by phone approximately one hour later, told him that they had a search warrant for his house, and asked him to step outside. Vol. II, 192-194. Winters responded that he was no longer at the house, but in Jackson, Mississippi. Vol. II, 194. Agents later learned that there was a back door to the house, and Winters had left through the back door. Vol. II, 195.

When agents entered Winters' residence pursuant to the search warrant, they smelled an odor of burned marijuana. Vol. II, 195. Agent Price saw that the house was equipped with a four-camera surveillance system feeding a live monitor. Vol. II, 196. Agent Price noted and photographed digital scales with residue and a razor blade. Vol. II, 196, 203-204. Agents also photographed a large air-brushed portrait of Johnny Winters hanging on the wall with the words "*Slugga*," "*100% Pure*," and "*Blood Money Boss*" on it, depicting Winters wearing large pieces of jewelry and holding wads of cash. Vol. II, 197, 202-203.

During the search, Agent Price also located two business cards, advertising upcoming rap events, with a picture of Johnny Winters and the word "Slugga" at the top. Vol. II, 198, 206-207. Agent Price introduced these cards, along with photographs taken during the search of the residence, at the trial. Vol. II, 176-177; Trial Exhibit #32, Promotional cards found at the residence of Johnny Winters, Jr.

**Johnny Winters' Louisiana Arrest**

On June 29, 2010, during the time frame of the charged conspiracy, Johnny Winters was arrested in Louisiana after fleeing from law enforcement and throwing cocaine out of the window of a moving vehicle. Vol. II, 176-177. Although arresting officers from Louisiana were prepared to testify about their arrest of Winters and seizure of cocaine, the trial court ruled that the Louisiana arrest was more prejudicial than probative, and was therefore inadmissible. Vol. II, 186.

**DiCarlos Henderson's Testimony**

Following the testimony of Agent Jackson Price, DiCarlos Henderson was called as a witness by the United States and testified that he had distributed cocaine to Johnny Winters on behalf of Quincy Terry. Vol. III, 100-102. Henderson testified that he began collecting money and delivering drugs for the Terry Drug Trafficking Organization in March or April of 2009 in an effort to repay a debt owed to his brother Quincy Terry, after Terry hired a lawyer to defend Henderson on a criminal case. Vol. III, 88-89. Henderson explained that Quincy Terry introduced Henderson to Johnny Winters, Jr., or "Slugga" in Grenada around December of 2009, and he began delivering cocaine to Winters on behalf of Terry. Vol. III, 98-100. Henderson testified that he delivered cocaine to Winters on three occasions between December 2009 and his arrest in March 2010, with the largest delivery being one kilogram of cocaine on the first occasion. Vol. III, 110, 136. He testified that on two other occasions, he delivered cocaine to Winters in four-ounce quantities. Vol. III, 110-111.

Henderson identified the drug ledger seized from the time of his arrest and identified the nicknames listed as well as the individuals associated with those nicknames. Vol. III, 103-110. Henderson testified that "Slug" was a reference to "Slugga" or Johnny Winters, Jr., and that the number "32,000" indicated the price for the kilogram of cocaine that Winters had received. Vol. III, 107-108. Henderson testified that Winters paid $24,000 for the kilogram of cocaine up front, he delivered the cocaine to Winters in Grenada, and Winters later paid the remaining amount for the

kilogram. Vol. III, 108. Henderson further testified that the notation "owe 1800" meant that Winters owed the organization $1,800. Vol. III, 109-110.

### Henderson's Testimony Concerning Intercepted Communications

Henderson also identified several intercepted calls and electronic communications that were intercepted on the wire, including communications with Johnny Winters, Jr. Vol. III, 111-120. Henderson explained various drug related references in the calls and discussed in detail the calls between himself and Winters. Vol. III, 111-120. Henderson explained that on February 16, 2010, Winters inquired about the availability of cocaine. He also testified that the text he received from Winters on February 18, 2010, was another inquiry into the availability of cocaine, and he advised Winters that there was still none available. Vol. III, 117-125. Henderson further testified about a March 6, 2010 call in which Winters again inquired about the availability of cocaine. Vol. III, 111, 126-133. Henderson testified that he explained to Winters in his response that the next shipment he expected to receive would be the "ready" way, which was a reference to crack cocaine. Vol. III, 132-133. He also testified that when he told Winters it would cost $3 a four way, he was referencing a price of $3000 for four ounces of cocaine. Vol. III, 123.

### Claims for Relief Under 28 U.S.C. § 2255

In the instant § 2255 motion, Johnny Winters makes the following claims for relief, all based upon a theory of ineffective assistance of counsel:

(1) Trial counsel failed to argue Miranda Rights at the suppression hearing;

(2) Trial counsel failed to argue Fourth Amendment Violations at the suppression hearing;

(3) Trial counsel failed to challenge the inclusion of a deliberate ignorance jury instruction;

(4) Trial counsel failed to argue the defendant's version of events regarding whether he knew a firearm was near him on the couch when law enforcement officers arrived;

(5) Appellate counsel failed to argue a violation of the rule established *Giglio v. United States*, 405 U.S. 150 (1972) regarding the testimony of DiCarlos Henderson as to the amount of cocaine the government seized during his arrest;

(6) Appellate counsel failed to challenge the government's use of the defendants' co-conspirators' guilty pleas as substantive evidence in the case; and

(7) Appellate counsel failed to object to an erroneous calculation under Sentencing Guidelines to determine the advisory range of incarceration.

For the reasons set forth below, none of these grounds for relief has merit, and the instant Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 will be denied.

### Procedural Issues

The government raises two arguments in support of dismissing the instant Motion to Vacate, Set Aside, or Correct Sentence on procedural grounds. First, the government argues that Winters failed to file the instant motion before the expiration of the one-year limitations period set forth in 28 U.S.C. § 2255(f). The government also argues that Winters' motion is barred because all of the issues in the present case involve ineffective assistance of counsel, and the Fifth Circuit rejected the issue of ineffective assistance of trial counsel when reviewing this case on direct appeal. These arguments are unavailing.

Motions to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 are subject to a one-year limitations period:

(f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1) the date on which the judgment of conviction becomes final;

(2) the date on this the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). In this case, subsection (1) applies; the limitations period starts to run from "the date on which the judgment of conviction becomes final." The Fifth Circuit held that, as with the *habeas corpus* challenge to a state conviction under 28 U.S.C. § 2254, the limitations period to challenge to a federal conviction under 28 U.S.C. § 2255 "becomes final generally upon the expiration of direct review or the time for seeking direct review." *United States v. Plascencia*, 537 F.3d 385, 388 (5th Cir. 2008). Thus:

> [f]or the purpose of starting the clock on § 2255's one-year limitation period . . . a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction.

*Clay v. United States*, 537 U.S. 522, 525, 123 S. Ct. 1072, 1074, 155 L. Ed. 2d 88 (2003). Finally, when a criminal defendant chooses not to pursue a direct appeal of his conviction, that conviction "becomes final for purposes of § 2255 upon the expiration of the [14]-day period for filing a direct appeal." *United States v. Plascencia*, 537 F.3d 385, 388 (5th Cir. 2008).

The court entered judgment in this case on May 4, 2012, and Winters filed a Notice of Appeal on May 10, 2012. The Fifth Circuit Court of Appeals affirmed the judgment on July 12, 2013, and the 90-day deadline for seeking certiorari review in the United States Supreme Court expired on October 10, 2013. Thus, Winters' conviction became final on October 10, 2013, and the limitations period for § 2255 review expired a year later on October 10, 2014. Winters filed the instant Motion to Vacate, Set Aside, or Correct Sentence on March 3, 2014, long before the deadline expired. The instant motion for § 2255 relief is, therefore, timely.

The government also argues that Winters' present claims of ineffective assistance of trial counsel are barred because he raised the general issue of ineffective assistance (though based upon different facts) on direct appeal. This argument is likewise without merit, as – for a host of reasons – the best time for the court to review ineffective assistance of counsel claims is during the process of collateral review. *Massaro v. United States*, 538 U.S. 500, 504-505 (2003).

**Ineffective Assistance of Counsel**

The court must address claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient and that the deficiency resulted in prejudice to her defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997).

**Claims Regarding Performance of Trial Counsel**

**Failure to Argue that Winters' Statement Should
Be Suppressed Under *Miranda v. Arizona***

Mr. Winters alleges first that trial counsel failed to argue that the government violated his *Miranda* rights at the suppression hearing. This allegation is demonstrably false. In *Miranda v. Arizona*, the Supreme Court held that a person "deprived of his freedom of action in any significant way" could not be questioned unless he waived his rights after being advised: (1) "that he has the right to remain silent," (2) "that anything said can and will be used against the individual in court," (3) "that he has the right to consult with a lawyer and to have the lawyer with him during interrogation,"

- 16 -

and (4) "that if he is indigent a lawyer will be appointed to represent him."  *Miranda v. Arizona*, 384

U.S. 436 (1966).

It is undisputed that the investigating agents did not advise Mr. Winters of his rights set forth

in *Miranda* before questioning him.  The agents told Mr. Winters, multiple times, that he was not

under arrest and was free to go whenever he wished.  Under these facts, counsel made the argument

that, despite the agents' statements to the contrary, Mr. Winters was not really free to leave because the

overall situation was coercive.  In the motion [30] to suppress, itself, counsel argued:  (1) that Winters'

statements to investigators "were not freely and voluntarily given and are the result of mental

coercion," and (2) that Winters, a convicted felon, "should have been mirandized after being found in

the residence . . . near a firearm . . . and marijuana."  In the brief [31] in support of the motion to

suppress, counsel argued that Winters' statements were not voluntary, that the agents' questioning was

a custodial interrogation.  At the July 12, 2011, hearing on the motion to suppress, counsel examined

the agents about their investigation, entry into a house to execute a search warrant, and subsequent

questioning of Mr. Winters.  Suppression Hearing Transcript [36].  Counsel's questions and arguments

throughout the hearing centered on whether Mr. Winters was effectively in custody, through mental

duress and coercion, and should therefore have received *Miranda* warnings.  *Id.*

Then, at trial, counsel requested a mistrial when testimony came out that, when carrying out

the search warrant, agents had seized Winters' cellular phone, then returned it to him a short time later

when they met to talk at a nearby lake.  Vol. III, 255-265.  Counsel argued that the agents had stated or

inferred that Mr. Winters had to meet with them and talk in order to get his cell phone back, thus

rendering the exchange between them a custodial interrogation requiring *Miranda* warnings.  *Id.* at

262-265.  The court rejected that argument.  *Id.* at 265.  Despite Mr. Winters' allegations to the

contrary, counsel argued that Winters' statements to investigators should be suppressed; the court

simply rejected those arguments.  This ground for relief is without merit and will be denied.

**Failure to Argue that Winters' Cell Phone Was**
**Seized Without a Search Warrant**

Mr. Winters next argues that counsel provided ineffective assistance because he did not challenge the seizure of Winters' cellular phone during the search of Timothy Bankston's house at 1341 Oak Street in Grenada, Mississippi. First, counsel may have concluded that Mr. Winters' cell phone fell within the scope of the search warrant for Mr. Bankston's house, as the warrant targeted evidence of illicit financial dealings related to the Terry Drug Trafficking Organization. In addition, none of the information gleaned from Mr. Winters' cell phone was introduced as evidence at trial. Instead, the information came from court-authorized wiretaps (for recorded conversations), pen registers (for information regarding which telephones contacted a target number), and data intercepts (for text messages). Vol. II, 34, 75-76, 90. Indeed, when asked on cross-examination, Agent Price testified that law enforcement did not use any information gleaned from Winters' cell phone to further the investigation into the Quincy Terry Drug Trafficking Organization:

Q.   Did you gather anything from the cell phone?

A.   I wrote some names down. I really didn't do a lot of followup on that.

Q.   So your investigation of his cell phone bore no fruit of criminal activity?

A.   I didn't really follow it too much, no, sir.

Vol. III, 42. The government did not introduce evidence from Winters' cell phone or use the information from the phone to find other evidence; as such, none of the government's proof was "fruit of the poisonous tree," and its seizure caused him no prejudice. *See Nardone v. United States*, 308 U.S. 338 (1939) (first describing the exclusionary rule using the "poisonous tree" metaphor); *see also Mapp v. Ohio*, 367 U.S. 643 (1961) (applies to state prosecutions), *Wong Sun v. United States*, 371 U.S. 471 (1963) (enunciating the standard for the exclusionary rule). This claim for relief is without merit and will be denied.

**Failure to Object to Deliberate Ignorance Instruction**
**Regarding the Handgun Found in the Couch**

Winters argues that trial counsel should have objected to a deliberate ignorance jury instruction as it pertained to possession of the firearm found inches from Winters' leg on a couch during a search of Timothy Bankston's house.  The instruction at issue is optional language from the Fifth Circuit Pattern Jury Instruction # 1.37, which defines the word "Knowingly."   Winters argues that this instruction was unfairly prejudicial to his defense of the gun charge.  Agents Price and Gibbs testified at trial that they entered a residence to execute a search warrant and saw Johnny Winters seated on a couch with a firearm in plain view, its grip protruding from the couch cushion a few inches from his leg.  Vol. II, 145-146.  As Agents Price and Gibbs entered, Winters raised his hands in the air and moved away from the couch.  Vol. II, 146.  When the agents asked Winters about the handgun, he claimed that he did not know it was there, even though he had slept on the couch all night.  Vol. III, 47-48.  The government argued that Winters' conduct at the scene suggested he was aware of the gun – and that he could not have spent the night on the couch without noticing the gun protruding from the cushions of the couch.  Lanekia Brown, who had spent the night on the couch with Winters, testified that she had thrown a large party the night before and that someone from the party could have left the handgun behind.  Vol. III, 48-49, 200, 203, 205-206.  She also testified that the handgun was not visible when Agents Price and Gibbs entered the house but was discovered later when other law enforcement officers removed the cushions from the couch while executing the search warrant.  Vol. III, 205-206.  Given the testimony of the agents, the deliberate ignorance instruction was proper.  Though Ms. Brown's testimony conflicted with that of Agents Gibbs and Price, it was the province of the jury, as factfinder, to weigh the credibility of the witnesses and determine the facts of the case.  Winters has shown neither deficiency in counsel's performance, nor prejudice from counsel's decisions; as such, defense counsel provided effective assistance, and this claim for relief is without substantive merit.

**Failure to Argue Winters' Version of Events Regarding**
**the Agents' Entry and Discovery of the Firearm**

Winters also argues that counsel was ineffective because he failed to present Winters' version of events regarding the agents' entry into Timothy Bankston's house and discovery of the handgun in the couch. This allegation is demonstrably false, as Winters' counsel examined or cross-examined every person present during the agents' entry into the house (except Winters, himself). Winters argues that he told his attorney that "the weapon was tucked deep into the sofa[']s cushion, that was covered by an armrest pillow" – that "the firearm was not in 'plain view' when [the agents] entered the home." Doc. [89] at 22. Lanekia Brown's testimony before the jury was consistent with Winters' version of events. Vol. III, 48-49, 200, 203, 205-206. The agents testified that the firearm was tucked partway into the couch cushion nearest to the armrest, with the grip clearly visible from across the room, two to three inches from Winters' leg. Vol. II, 145-146, Vol. III, 245-246. As set forth above, the jury is responsible for weighing the evidence and determining the credibility of witnesses. Winters' counsel presented testimony from every available witness, but the jury believed the agents. Thus, defense counsel provided effective assistance, and this ground for relief is without substantive merit.

## Claims Regarding Performance of Appellate Counsel

**Failure to Argue a *Giglio* violation**

Johny Winters alleges that appellate counsel was ineffective for failing to argue a violation of the holding in *Giglio v. United States*, 405 U.S. 150 (1972*)*, that, when the reliability of a witness may well be determinative of guilt or innocence, the prosecution's failure to disclose evidence affecting credibility is controlled under the holding of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Thus, the holding in *Giglio* is merely the application of *Brady* to evidence affecting the reliability of a witness. There are three components of a true *Brady* violation:

The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). As discussed below, this ground for relief is wholly without merit and will be denied.

Winters argues that DiCarlos Henderson, a cooperating witness for the government, testified that he was arrested with approximately 11 ounces of cocaine and crack cocaine, when the total amount recovered at the scene was over 100 ounces. Winters argues that the government had an ethical and professional duty to "notify the court of its witness' perjurious testimony" – and that, had the government corrected this error, Henderson would have been discredited, and the jury would have acquitted Winters.

DiCarlos Henderson testified on direct that he was arrested on March 8, 2010, with Quincy Terry while they were in possession of a quantity of cocaine that Terry was cooking into crack. Vol. III, 129. On direct examination, the government asked Henderson what he was charged with, and he responded, "Conspiracy and possession. I was caught with – we were caught with 11 ounces." Vol. III, 93.

Defense counsel cross-examined Henderson about his arrest on March 8, 2010, and whether he had testified that he was arrested with 11 ounces of coaine. Henderson responded, "Yes sir. To my knowledge it was 11 ounces." Vol. III, 157. When pressed further about the amount and how he arrived at a figure of 11 ounces, Henderson testified, "It was on my paperwork. I forgot how many grams, but I think – I can't remember how many grams but I think it equaled out to 11 ounces." Vol. III, 157. When asked whether he had actually been caught with a kilogram, Henderson testified, "It wasn't even a – it wasn't a kilo. A kilo wasn't found. It was just 11 ounces. It was like – I think there were 7 ounces of hard and, like, 4 ounces of powder." Vol. III, 157.

A review DiCarlos Henderson's testimony does not show that he lied or misled the jury as Winters suggests. Eleven ounces amounts to about 312 grams. While investigators recovered more than 11 grams during Winters' arrest, it was not all recovered together or in one lump amount. Instead, several quantities of cocaine or cocaine base were recovered, including one large amount that Henderson was attempting to flush down a toilet and which was ultimately retrieved from the toilet basin. Vol. II, 105, Gov. Exh. 23. DiCarlos Henderson testified that he thought that 11 ounces was recovered at the time of his arrest and that he believed that because he thought he remembered seeing that amount in his paperwork. Indeed, one of the quantities of cocaine recovered on March 8, 2010, was 304 grams, or about 11 ounces. Vol. II, 132, Gov. Exh. 21-A, 21-B. The evidence shows that DiCarlos Henderson simply suffered a failure of memory – and did not attempt to mislead or trick the court or the jury.

Overall, Henderson gave candid and detailed testimony, both on direct and cross examination, that he had been a part of a larger conspiracy to distribute many *kilograms* of cocaine – and that he had distributed cocaine to various people, including Winters, over a period of years. He testified that he was arrested on March 8, 2010, with Quincy Terry while they were in the process of cooking powder cocaine into crack cocaine. Henderson identified Johnny Winters' nickname from a drug ledger that was recovered at the scene of his arrest, and he verified drug-related phone calls and texts between him and Johnny Winters that had been intercepted during a wiretap. Henderson did not minimize his involvement; he readily admitted his actions before the jury.

While the total amount of cocaine recovered on March 8, 2010, was greater than Henderson remembered, the record does not show that Henderson intentionally lied or attempted to mislead the jury. The testimony showed that, when law enforcement officers arrived on March 8, Quincy Terry and DiCarlos Henderson frantically gathered as much cocaine as they could and tried to dispose of it down the toilet. Some of the cocaine was flushed away, but much of it backed up in the toilet, and

investigators had to break the toilet to retrieve what remained from its inner workings.  Under these hectic circumstances, Henderson's inability to recall the exact amount of cocaine recovered during the arrest is unsurprising.

In any event, the government put on other witnesses who revealed the precise amount of cocaine recovered during the March 8, 2010, arrest.  Agent Jason Price testified regarding the amounts recovered, and the government introduced lab reports into the record as exhibits.  Vol. II, 118-132, Gov. Exh. 16-A & B – 21-A & B.  Defense counsel was aware that the amount of cocaine recovered during the arrest was more than 11 ounces, and he used that discrepancy (among other things) to suggest that Henderson was an unreliable witness whom the jury should not believe.  Vol. II, 157-158.

As set forth above, a *Giglio* violation (a subset of a *Brady* violation) has three elements:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).  As to the first element, the discrepancy in DiCarlos Henderson's memory and testimony is arguably favorable to the accused, as it could cast doubt on Henderson's remaining testimony.  However, Winters cannot meet the second element, as the government did not try to suppress the actual amount of cocaine recovered; instead, through testimony and documentary evidence, the government clearly established the correct amount.  Neither has Winters established the third element, as, based upon Henderson's overall testimony and the government's other proof of drug quantity, Winters suffered no harm from Henderson's lapse in memory.  In any event, Henderson's testimony established that, regardless of the amount of cocaine recovered during the March 8, 2010, arrest, the amount of cocaine attributable to the Quincy Terry Drug Trafficking Organization during the multi-year life of the conspiracy was *far* more than 11 ounces; it was many kilograms.  For these reasons, Mr. Winters' appellate counsel offered effective assistance by deciding not to pursue a challenge regarding DiCarlos Henderson's testimony under the

holding of *Giglio v. United States*, 405 U.S. 150 (1972).  This claim for relief is without merit and will

be denied.

**Failure to Challenge the Government's Mention of
Co-conspirators and their Guilty Pleas**

Johnny Winters argues next that appellate counsel was ineffective for failing to argue on

appeal that the introduction at trial of evidence regarding his co-conspirators, including their guilty

pleas, caused unfair prejudice to his defense.  Winters was the only defendant charged in the

conspiracy indictment in this case; however, he was charged with conspiring with many people, who,

though not charged in the indictment, were nonetheless named as co-conspirators.  The elements of

conspiracy under 18 U.S.C. § 371 are:

> (1) an agreement between the defendant and one or more other persons to violate a
> law of the United States; (2) an overt act by one of the conspirators in furtherance of
> the conspiracy; and (3) the defendant's intent to further an unlawful objective of the
> conspiracy.  *See* 18 U.S.C.A. § 371 (West 1984)

*United States v. Sharpe*, 193 F.3d 852, 863 (5th Cir. 1999).

There is no requirement that the government use the minimum quantum of proof

necessary to sustain a conviction.  Indeed, as the government must prove each element of the

crime charged beyond reasonable doubt, it was entitled to put on evidence of the breadth and

scope of the criminal enterprise.  Presenting the jury with proof of the co-conspirators'

participation in the Drug Trafficking Organization accomplishes this goal.

DiCarlos Henderson, who was responsible for distributing drugs for Quincy Terry in North

Mississippi, pled guilty, cooperated with the government, and testified at Winters' trial.  During

Henderson's testimony about his drug distribution activities, he identified many people to whom he

distributed drugs, including Johnny Winters.  Vol. III, 88-91.  DiCarlos Henderson's identification of

others participating in the Drug Trafficking Organization was crucial because evidence recovered at

the time of his arrest (while cooking crack cocaine with Quincy Terry) included a drug ledger listing

multiple names and nicknames of co-conspirators, drug amounts sold, and money owed. Vol. III, 103-111. Johnny Winters' nickname was included on that ledger with an amount and dollar figure. The defense challenged the drug ledger, attacked its authenticity, and questioned whether it truly was a ledger of drug activity. The government then used Henderson, the cooperating witness and defendant's co-conspirator, to explain the ledger and to identify the names and references in it. Vol. III, 103-111

Similarly, the conspiracy included evidence from multiple wiretaps, including calls and electronic intercepts between Henderson and Winters. The co-conspirators used slang, drug trafficking jargon, and code words during these communications. Given the cryptic nature of the communications, the defense understandably challenged the substance of those intercepts. Thus, the government introduced DiCarlos Henderson's testimony explaining the drug-trafficking jargon and code words. In addition, the government introduced testimony regarding calls not only between Winters and Henderson, but also between Henderson and other co-conspirators so that the jury could decipher the context and substance of the calls. As part of the government's proof establishing the wide nexus between the participants, Agent Price and DiCarlos Henderson testified about drug-related calls between DiCarlos Henderson, Winters, and other members of the conspiracy. Vol. III, 111-129.

DiCarlos Henderson also testified that he had pled guilty to crimes arising out of the same Drug Trafficking Organization – and that nearly all of the co-conspirators in the Quincy Terry Drug Trafficking case had already pled guilty. Generally speaking,

> Defendants are entitled to have questions of guilt based on the evidence against them, "not on whether a government witness or a codefendant has plead guilty to the same charge." *United States v. Black,* 685 F.2d 132, 135 (5th Cir.1982) (quoting *United States v. Fleetwood,* 528 F.2d 528, 532 (5th Cir.1976))

*United States v. Delgado*, 401 F.3d 290, 299 (5th Cir. 2005). There are, however, times when "the government might have a legitimate evidentiary reason for bringing out testimony relating to its witnesses' prior convictions, even when those convictions are for charges similar or

identical to those upon which the defendant is being charged. *United States v. Delgado*, 401 F.3d 290, 299–300 (5th Cir. 2005) (internal quotations and citations omitted).

The following factors, considered carefully with all the facts and circumstances of the case, offer guidance to the court considering this issue: (1) whether the court gave a limiting instruction, (2) whether the government had a proper evidentiary purpose for offering evidence of the conviction and cooperation, (3) whether the conviction and cooperation were emphasized or used as substantive evidence, (4) whether introduction of the conviction and cooperation was invited by the defense, (5) whether defense counsel offered an objection or requested a limiting instruction, (6) whether defense counsel's failure to object might have been the result of trial strategy, and (7) whether, in light of all the evidence, the failure to give an instruction was harmless beyond a reasonable doubt. *United States v. King*, 505 F.2d 602, 608 (5th Cir. 1974); *see also Fleetwood, supra,* at 532.

The Fifth Circuit has overturned a conviction for the prosecution's use of such evidence, though that case had more egregious facts. *See United States v. Fleetwood*, 528 F.2d 528, 535-536 (5th Cir. 1976). In *Fleetwood*, a case involving bribery, the government called three witnesses:

> persons similarly charged, or . . . [who] had pled guilty to crimes involving bribery similar to those brought against [the defendant], and often founded on testimony from the same witnesses and involving the same transactions as those upon which his indictment was predicated.
>
> . . .
>
> Indictments were returned against eleven persons by the Grand Jury investigating instances of bribery exemplified by this case. At the time of [Fleetwood's] trial the case of ten of those persons had been disposed of. Most of the witnesses in [Fleetwood's] trial were also witnesses against the other ten defendants.

*Fleetwood*, 528 F.2d at 530. In that case, over defense counsel's repeated objections, three of the government's witnesses testified that they had participated in the bribery scheme, had cooperated with

the government, and had pled guilty to bribery. *Id.* at 530-531. The Fifth Circuit described the situation:

> The situation of witness Fedrick offers the best example of our meaning. Fleetwood and Fedrick were bribed by the same person, Scallan, to pass the same ship, the Virginia, at the same time, in the same incident . . . . They appeared to the jury, through the testimony of Hardee, Scallan, and Fedrick himself as equally guilty of the same crime.

*United States v. Fleetwood*, 528 F.2d 528, 532–33 (5th Cir. 1976). The government argued that it was merely bringing out adverse facts defense counsel would likely bring out on cross-examination – and then characterize the prosecution's failure to disclose them during direct as an act of concealment. *Id.* at 533. The Fifth Circuit disagreed, holding that the government had gone further than that:

> Here government counsel were not attempting to disclose adverse facts relative to the witnesses' credibility and thus protect or immunize government witnesses from an anticipated, damaging, cross-examination. Quite the opposite was true. One of the government's purposes in putting the grain inspectors on the stand was to disclose the fact that they had, under similar circumstances, pled guilty to receiving bribes. Even if this was not a state[d] purpose, the pattern of the government's examination of the former grain inspectors as to their guilt, the cumulative effect of the testimony, rendered it an inherent consequence. We believe pleas introduced under such circumstances to have been 'improperly emphasized, or used as substantive evidence of guilt'. *King, supra.* While information as to the guilty pleas might be logically relevant, in fairness to the accused the evidence should have been excluded.

*United States v. Fleetwood*, 528 F.2d 528, 533 (5th Cir. 1976). Further, one of the government witnesses in *Fleetwood* stated that his testimony resulted in a co-conspirator's decision to plead guilty. The Fifth Circuit held that, "[t]he impact of this statement was not only to rehabilitate [the testifying witness], the government's stated purpose, but also to besmirch Fleetwood with another man's conviction." *Id.* at 535.

Ultimately, the Fifth Circuit held that:

> Whatever the extent to which the defense had opened the door to the issue of Hardee's involvement in other bribes, the *repeated, methodical, and essentially unnecessary questioning* of Fedrick, Barrios, and Baker as to the determination of their guilt far overreached proper bounds and elicited improper testimony from these witnesses.

*Id.* (emphasis added). Indeed, the court held that even a cautionary instruction would have been insufficient to cure the taint of the testimony:

> The *cumulative impact* of this testimony, and *the emphasis placed upon it* by the government, was manifestly prejudicial, and without doubt harmful to the appellant. This is one of the examples anticipated by *Baete*. We doubt that any instruction, had one been given, would have cured the prejudicial impact of the testimony presented. Despite the solid evidence indicating appellant's guilt, the court's error in this matter was not harmless beyond a reasonable doubt.

*Id.* at 535-536 (emphasis added).

Though the government in the instant case did not address the seven factors set forth in *King, supra*, in its response to the instant motion, the factors are not in Winters' favor. As to the first factor, the court gave the jury a thorough limiting instruction regarding testimony of cooperating witnesses:

> In this case, the Government called as one of its witnesses an alleged accomplice named as a co-defendant with whom the Government has entered into a plea agreement providing for the possibility of a lesser sentence than the co-defendant would otherwise be exposed to for the offense to which the co-defendant pled guilty. Such plea bargaining, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court.
>
> An alleged accomplice, including one who has entered into a plea agreement with the Government, is not prohibited from testifying.
>
> On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty. You should keep in mind that such testimony is always to be received with caution and care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you belie[ve] that testimony beyond a reasonable doubt.
>
> The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence of the guilt of any other person.

Vol. IV, 12-13.

The second factor is arguably in Winters' favor, at least to the extent that DiCarlos Henderson testified regarding the convictions of the *other* co-conspirators.[1]  In a vacuum, the court can discern no proper evidentiary purpose for DiCarlos Henderson to have testified regarding the convictions and level of cooperation of the *other* co-conspirators.  On the other hand, Winters' counsel argued from the inception of the case that the government had applied undue pressure on Winters and the others to lie about their association with the conspiracy; thus, counsel opened the door for the government to put on evidence about the other conspirators and their willingness to provide information about the Quincy Terry Drug Trafficking Organization to show its existence and scope.

The present case is distinct from *Fleetwood* as to the third factor, as the government did not emphasize the convictions and cooperation of the co-conspirators; nor did the government use the testimony as substantive evidence.  The government mentioned the convictions and cooperation of the co-conspirators (other than DiCarlos Henderson) only once during its case-in-chief, and, during closing, even invited the jury to wholly disregard Henderson's testimony.  By contrast, in *Fleetwood*, government counsel, over objection, elicited testimony from *three* separate witnesses that each had entered pleas of guilty "to a large extent predicated on the same evidence, the same testimony, as the case here in controversy."  *Id*. at 532.  Government counsel in *Fleetwood* thus engaged in "the *repeated*, *methodical*, and essentially *unnecessary* questioning of

---

[1] As to Henderson's testimony regarding his *own* cooperation and guilty plea, the government may elicit testimony regarding a cooperating witness's plea agreement to attenuate the effect of such questions on cross-examination:  "Where, as here, the codefendant is a witness at trial, subject to the rigors of cross-examination, disclosure of the guilty plea to blunt the impact of attacks on [his] credibility serves a legitimate purpose and is permissible.  *See United States v. Veltre,* 591 F.2d 347, 349 (5th Cir.1979)).

[the three co-conspirators] as to the determination of their guilt[,] [and thus] far overreached proper bounds and elicited improper testimony from these witnesses." *Id.* at 535. (emphasis added). The government did not go that far in the present case.

In this case, the government elicited such testimony from only *one* witness, DiCarlos Henderson, on *one* occasion. Government counsel asked Henderson to name the people to whom he had sold cocaine, and Henderson named Theophilis Batteast, Eric Brown, Sean Longs, Starskey Shaw, Timothy Bankston, and Edward House. Vol. III, 90-91. As to each of these co-conspirators DiCarlos Henderson testified that: (1) the co-conspirator was convicted, and (2) that he cooperated with the government. *Id.* The government then moved on – and (other than DiCarlos Henderson) never mentioned the convictions or cooperation of the co-conspirators again. The government mentioned Henderson's guilty plea only once more at trial, during closing arguments, stating merely that "[Henderson] has pled guilty to his role in this conspiracy. He has been sentenced." Vol. IV, 32. Indeed, later during closing argument, as he had during opening statements, government counsel invited the jury to simply *ignore* Henderson's testimony altogether and, instead, decide the case based upon the ample remaining evidence: "Don't even listen to DiCarlos Henderson. Take it and punt it right out of here. Now, how do you change the facts of the case?" Vol. IV, 60. The single mention of Henderson's testimony regarding the other co-conspirators' convictions and cooperation was minimal; certainly counsel for the government did not engage in repeated, methodical, and unnecessary questioning. The third factor thus favors the government.

The fourth factor also favors the government, as the defense invited testimony regarding the co-conspirators' convictions and cooperation. A big part of defense counsel's argument was that government agents and prosecutors trumped up a case against Winters out of retaliation because he would not cooperate and testify against others in the Quincy Terry Drug Trafficking Organization. As defense counsel set forth in his opening statement:

> This is a case of your government retaliating against my client because my client
> failed to cooperate with their investigation just because he knew these guys. He didn't
> have anything to tell on these guys. *He didn't know anything about these guys'*
> *dealings, all of these people. And they're going to bring a snitch in, and the snitch is*
> *going to tell you that him and Johnny Winters dealt drugs.*

Vol. I, 35 (emphasis added). A short while later, counsel said:

> All these things were used to create a zone of fear in order to get Johnny Winters to
> testify to make their case strong. *The same thing that they're going to do to that*
> *snitch, to DeCarlos Henderson in here today*, and to lie about other people to make
> their case strong. And I don't understand why they do it. They got the best police
> officers in the world.

Vol. I, 38 (emphasis added). A bit later in his opening, defense counsel pointed out that others

involved in the conspiracy "in the other indictment" were already incarcerated:

> [B]y the time they rush into 1341 Oak Street on an indictment concerning *Timothy*
> *Bankston, many of the people that were involved in the other indictment of the Quincy*
> *Terry organization were already in jail*. There may be another incident that comes out.
> In time, other individuals that are claimed to be involved are already in jail.

Vol. I, 43. Defense counsel also states that:

> Agent Price will tell you, and he's good, that all these other people were indicted
> beforehand. They learned about Johnny, and they stumbled upon him, and they said,
> 'Well, he's going to help us make our case.' . . . . *[T]hey had to provide Johnny with*
> *the proper encouragement, and that proper encouragement was holding over –*
> *holding the fact over his head that he was a convicted felon, he was in a house with a*
> *gun, he was in a house with marijuana, and that he knew these people.*

Vol. I, 44 (emphasis added). So, during opening statements, defense counsel made quite clear that a

big part of Winters' defense strategy was to argue that government investigators and attorneys

prosecuted a false case against him because he would not assist in the investigation by lying about the

drug activity of others – even though he supposedly knew nothing about their illegal drug dealings.

Counsel also argued that investigators and prosecutors had pressured witness DiCarlos Henderson and

others into falsely testifying against others "to make [the government's] case strong" to falsely convict

each other. Defense counsel, as part of his strategy, conceded that other members of the conspiracy

were cooperating with the government.

Counsel for the government, by contrast, simply recited the facts the government intended to prove and the evidence that the government would present to prove those facts. As to the other participants in the conspiracy, government counsel stated:

> This case was one of the largest cocaine networks ever in the Northern District of Mississippi, numerous defendants, and you're just hearing about one of them today. *There's just one defendant on trial today, part of the large conspiracy.*

Vol. I, 24. (emphasis added). Counsel was likewise careful to let the jury know DiCarlos Henderson's limited role in the trial:

> But understand this. *This case is not proven by DeCarlos Henderson. He's here to interpret some wires for you.* This case is proven by the words of [Winters'] mouth when he talks on those recorded calls. It's proven by the phone toll information where he called DeCarlos Henderson thirty-four times. It's proven by his name on that drug ledger. It's proven by that gun on the couch right next to him. It's proven by his words when he says he dealt with Quincy Terry himself for three years. It's proven by his house with his picture on the wall that says "Slugga," confirming who he is. It's proven by the digital scales and the razor blades.

Vol. I, p. 31. (emphasis added).

Defense counsel's primary argument was that at least part of the conspiracy charged in the indictment was fictional and that the government applied pressure on Winters, Henderson, and others to tell lies to support those fictional charges. This argument opened the door for the government to offer proof in rebuttal, and part of that proof was that Henderson and others involved in the conspiracy had cooperated with the government, told the truth, and had been convicted. The cooperation and convictions tend to show that the conspiracy actually existed. Thus, as defense counsel opened the door to that area of inquiry, the fourth factor favors the government.

The Fifth factor also favors the government, as the defense did not object to the testimony or seek a limiting instruction (though the court gave such an instruction, regardless).

The Sixth factor favors the government, as well; a sound defense strategy would have been to ignore the single mention of the co-conspirators' convictions and cooperation to avoid driving those facts home to the jury. In addition, as defense counsel had mentioned cooperation by the co-

conspirators in opening statements, an objection to the government's mention of them would have been fruitless.

Finally, as to the Seventh factor, the court actually gave the jury a limiting instruction. In any event, in light of the overwhelming evidence of Winters' guilt, even if the government's single use of the testimony constituted error, that error was harmless. During closing, after government counsel told the jury to ignore DiCarlos Henderson's testimony, he recounted the remaining evidence of Winters' guilt:

 (1) wiretaps with Winters' voice on them discussing distribution of cocaine and crack cocaine,

 (2) Winters' detailed and highly incriminating statements to law enforcement officers after the search of Timothy Bankston's house regarding Winters' participation in the drug trafficking conspiracy (including length of time, amounts distributed, names of suppliers, the name of the person he used to "cook" crack cocaine, etc.),

 (3) intercepted communications of Quincy Terry, DiCarlos Henderson, Theophilus Batteast, Sean Longs, Starskey Shaw, Edward House, and Eric Brown (all members of the conspiracy) regarding cocaine trafficking,

 (4) Winters' 34 communications with DiCarlos Henderson,

 (5) Winters' nickname included among the co-conspirators' names on the drug ledger obtained during the raid while Quincy Terry and DiCarlos Henderson were cooking a large quantity of powder cocaine into crack cocaine,

 (6) Winters' presence in co-conspirator Bankston's house, with a handgun inches from him, during the execution of a search warrant,

 (7) the presence of digital scales with white powder residue on them in Winters' house, and

 (8) the arrest of Quincy Terry and DiCarlos Henderson, who were cooking crack cocaine, two days after Henderson told Winters that there was no powder cocaine available, but in a few days he could get some "the ready way" (in crack cocaine form.)

Vol. IV, p. 60-67.

In sum, of the seven factors the court must consider, only one even arguably favors Mr. Winters: (2) whether there was a proper evidentiary purpose for the testimony. The other six factors favor the government. Even if the court were to find that permitting the testimony constituted error,

the error was harmless. The remaining evidence of Winters' guilt was overwhelming, and the court cannot conceive that the single mention of the convictions and cooperation of the other members of the conspiracy had any impact on the outcome of the case (especially when the government went to great pains to inform the jury of the limits of Hendreson's testimony). For these reasons, Mr. Winters' ground for relief regarding testimony as to the convictions and cooperation of co-conspirators is without merit and will be denied.

Winters further complains that Henderson testified about the state court conviction of another member of the conspiracy, Adrian Terry. Henderson explained on the stand that Adrian Terry had taken over drug distribution operations in North Mississippi for his brother, Quincy Terry. Henderson's testimony established that Adrian Terry had gone to prison, and Quincy Terry then asked his brother, DiCarlos Henderson, to take over Adrian Terry's drug distribution duties. Vol. III, 88-91. Winters not shown how the testimony prejudiced his legal position or that his counsel was ineffective for failing to challenge the testimony on appeal.

**Failure to Challenge Incorrect Guidelines
Calculation Applied During Sentencing**

Mr. Winters also argues that his attorney during sentencing and appeal was ineffective for not raising as an issue trial counsel's failure to challenge the court's application of the Sentencing Guidelines. Mr. Winters believes that he received 8 criminal history points for two prior felony convictions and two misdemeanors. He argues that one of the prior felonies should not have been used when calculating the proper Guidelines sentencing range for an offense under 18 U.S.C. § 922(g). Specifically, Mr. Winters complains first that counsel failed to object to an incorrect guideline calculation – that he received criminal history points for a Possession of Cocaine conviction that was more than ten years old. *See PSR,* at ¶50-52. He argues that he received a three-year sentence for the 1997 conviction which would have expired in January of 2000 and was therefore more than ten years old at the time the instant offense occurred in June of 2010. However, the PSR

reflects that Winters was not discharged from custody for the 1997 Possession of Cocaine conviction until January of 2004.

Under U.S.S.G. § 4A1.1 and 4A1.2 (e)(1), the court must add three criminal history points for any conviction in which a sentence of more than a year and a month is imposed. Section 4A1.1 states that in calculating a defendant's criminal history category, the court is to "[a]dd 3 points for each prior sentence exceeding one year and one month." Section 4A1.2(e)(1) states:

> (1) Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

U.S.S.G. § 4A1.2(e)(1). The court must count any conviction which occurred within the prior fifteen years if a sentence of more than a year and a month was imposed. Further, the sentencing guidelines require the court to look at the date a term of imprisonment actually expired rather that the date that the sentence was originally scheduled to expire:

> For purposes of applying § 4A1.1(a), (b), and (c), if prior sentences are treated as a single sentence, use the longest sentence of imprisonment if concurrent sentences were imposed. If consecutive sentences were imposed, use the aggregate sentence of imprisonment.

U.S.S.G. 4A1.2(a)(2) and § 4A1.1 Application Note 1. In this case, Winters' term of imprisonment for Possession of Cocaine was calculated as having expired on January 5, 2004, because that sentence ran concurrent to another longer sentence imposed for Armed Robbery. *PSR* at ¶ 48, 49 and 52. The conviction is therefore well within a 15 year window (and even a 10-year window) of the crime charged in the instant case and falls within the purview of § 4A1.1 and 4A1.2 (e)(1). Sentencing and appellate counsel John Daniels was provided effective assistance in declining to argue this issue.

Regardless, Winters faced a mandatory minimum sentence of 120 months on Count One of the indictment. Thus, even if three criminal history points were subtracted from his overall Criminal History Score, his term of incarceration could not have been less than 120 months. In this case, the

court sentenced Winters to 121 months imprisonment – only one month more that the statutory minimum.

Counsel presented several arguments concerning the base offense level at sentencing and on appeal and prevailed on one issue. The Fifth Circuit reviewed counsel's arguments and held that the trial court had originally miscalculated the offense level applicable in this case – that the proper offense level should have been 27, rather than 29. The original, incorrect, Guidelines range was 121 to 151 months; the corrected range was 120 to 125 months, and the Fifth Circuit noted that Winters faced a statutory minimum sentence of 120 months because he had a prior felony drug conviction. 21 U.S.C. § 841(b)(1)(B). The Fifth Circuit held, however, that even under the corrected Guidelines range, Winters' sentence of 121 months (only a month longer than the statutory minimum sentence) was proper. Sentencing and appellate counsel provided Winters zealous representation and even prevailed on one issue during direct appeal. Counsel also provided effective assistance in his decision not to challenge Winters' criminal history category, and this ground for relief will be denied.

## Conclusion

In sum, none of the Movant's grounds for relief has merit, and the instant Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 will be denied. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 17th day of March, 2017.

 /s/ Neal Biggers
NEAL B. BIGGERS
SENIOR U. S. DISTRICT JUDGE